FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
ALEXANDER BRENDON GURA (SBN 305096)
gura@novianlaw.com
**NOVIAN & NOVIAN LLP**
1801 Century Park East, Suite 1201
Los Angeles, California 90067
Telephone:   (310) 553-1222
Facsimile:    (310) 553-0222

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN KANG, an individual, on behalf of himself and SKYBLOCK, LLC and MID-WILSHIRE CONSULTING, LLC; PRASAD HURRA, an individual; DAVID KIM, an individual, on behalf of himself and BLUE BLOCK GROUP; ARTEMIO VERDUZO, an individual; DAVID KWON, an individual; and YOUNG JAE KWON, an individual, | Case No.: |
| | **COMPLAINT** |
| | <u>**JURY TRIAL DEMANDED**</u> |
| Plaintiffs, | |
| v. | |
| HYBRID TRADE LIMITED, an unknown business entity; ASIA DIGITAL ASSET EXCHANGE, an unknown business entity; ALLYSIAN SCIENCES, an unknown business entity;  APOLO OHNO, an individual; ROD JAO, an individual; EUGENIO PUGLIESE, an individual; HENRY LIU, an individual, and DOES 1 through 10, inclusive, | |
| Defendants. | |

Plaintiffs Brian Kang ("Kang"), on behalf of himself, Skyblock, LLC ("Skyblock") and Mid-Wilshire Consulting, LLC ("MWC"), Prasad Hurra ("Hurra"), David Kim ("Kim"), on behalf of himself and Blue Block Group ("BBG"), Artemio Verduzo ("Verduzo"), David Kwon ("D. Kwon") and Young Jae Kwon ("J. Kwon"), together with their principals, agents, predecessors, successors, and assigns (collectively, "Plaintiffs"), hereby allege as follows against Defendants Hybrid Trade Limited ("Hybrid"),  Asia Digital Asset Exchange ("ADAX") Allysian Sciences ("Allysian"), Apolo Ohno ("Ohno"), Rod Jao ("Jao"), Eugenio Pugliese ("Pugliese"), Henry Liu ("Liu"), and Does 1-10 (collectively, "Defendants").

## SUMMARY

1. Between approximately January 2018 and June 6, 2018, Defendants offered and sold digital tokens (the "Hybrid Token"), raising approximately $50 million from investors based around the world, including within the United States. However, Defendants' offer and sale of Hybrid Tokens was neither registered with the United States Securities and Exchange Commission (the "SEC") nor qualified for any exemption from registration with the SEC, thereby depriving investors of the benefit of the disclosures required by the federal securities laws.  Moreover, to date, Defendants have yet to satisfy *any* of their commitments to investors. Defendants squandered and/or misappropriated, and purported to lose by theft, all or nearly all of the approximately $50 million raised through their offer and sale of Hybrid Tokens.  Defendants' offer and sale of Hybrid Tokens was, in actuality, a mere vessel for Defendants' personal enrichment.  This is precisely the sort of scenario the federal securities laws were enacted to prevent.

2. Congress enacted the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") to regulate the offer and sale of securities.  In contrast to commerce, which often operates under the principle of *caveat emptor*, Congress enacted a regime of full and fair disclosure, requiring those

who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest. Such disclosure is ordinarily provided in a "registration statement," which provides public investors with financial and managerial information about the issuer of the securities, details about the terms of the securities offering, the proposed use of investors proceeds, and an analysis of the risks and material trends that would affect the enterprise.

3. Section 5(a) of the Securities Act, 15 U.S.C. § 77e(a), provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce. Section 5(c) of the Securities Act, 15 U.S.C. § 77e(c), provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies. Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of unregistered securities in interstate commerce, absent an exemption.

4. Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. § 77k & 77l(a)(2), respectively, prohibit material misstatements and omissions in prospectuses and registration statements, respectively. More generally, Section 17(a) of the Securities Act prohibits material misstatements and omission in connection with the sale of securities. Section 10(b) of the Securities Act and SEC Rule 10b-5, 17 C.F.R. 240.10b-5, provide purchasers of securities a private right of action against all persons and entities who use deceptive devices in connection with the offer and sale of securities.

5. The definition of "security" includes a wide range of investment vehicles, including stocks, bonds, and "investment contracts." Investment contracts are transactions where an individual invests money in a common enterprise and reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others. In a variety of circumstances, courts have found that investment

vehicles other than stocks and bonds constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet.  As the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable scheme devised by those who seek the use of the money of others on the promise of "profits."

6. The SEC has stated that digital tokens, such as Hybrid Tokens, often constitute securities. *See Investor Bulletin:  Initial Coin Offerings*, U.S. Securities and Exchange Commission (Jul. 25, 2017), https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings ("[I]n certain cases, the tokens or coins will be securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration[.]").  According to the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies." *Press Release:  SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (Jul. 25, 2017), https://www.sec.gov/new/press-release/2017-131.

7. In several speeches, the SEC's leadership has reinforced this view.  For example, in a November 8, 2017, speech entitled *Governance and Transparency at the Commission and in Our Markets*, Jay Clayton, then-Chairman of the SEC, stated:  "I have yet to see an [Initial Coin Offering ("ICO")] that doesn't have a sufficient number of hallmarks of a security."  A few months later, on January 22, 2018, then-Chairman Clayton cautioned those involved in the ICO process, stating: "My first message is simple and a bit stern.  Market professionals, especially gatekeepers, need to act responsibly and hold themselves to high standards.  To be blunt, from what I have seen recently, particularly in the initial coin offering space, they can do better."  Then-Chairman Clayton further stated:  "First, and most disturbing to me, there are ICOs where the lawyers involved appear to be, on the

one hand, assisting promoters in structuring offerings of products that have many of the key features of a securities offering, but call it an 'ICO,' which sounds pretty close to an 'IPO.'  On the other hand, those lawyers claim the products are not securities, and the promoters proceed without compliance with the securities laws, which deprives investors of the substantive and procedural investor protection requirements of our securities laws."

8.  As described in more detail herein, Defendants created, offered for sale, and sold approximately $50 million worth of securities known as Hybrid Tokens. Defendants neither registered their offer and sale of securities with the SEC, nor qualified for any exemption from registration, as the law requires.  Worse still, Defendants misled and duped their investors, ultimately delivering on *none* of their commitments to investors.

9.  Defendants attempted to avoid the reach of the federal securities laws by characterizing the Hybrid Token as a "utility token."  However, when assessing whether something is a security under the federal securities laws, courts—including those in the Ninth Circuit—have repeatedly stated that they will ignore the form of the transaction, and instead focus on the substance and economic reality of the transaction.  Here, Defendants' sale of Hybrid Tokens had all the hallmarks of a securities offering under the securities laws and was therefore required to be registered with the SEC.  No exemption to the registration requirement was available for Defendants' offer and sale.

## PARTIES

10. Mr. Kang is, and at all relevant times was, a citizen of the United States and resident of Los Angeles, California.  Throughout 2018, Mr. Kang, on behalf of himself, Skyblock, and MWC, invested approximately $1,461,620 in Hybrid Tokens via transfers of Ethereum, a widely used cryptocurrency ("Ethereum," "Ether," or "ETH").

///

11. Mr. Hurra is, and at all relevant times was, a citizen of India and resident of the United States.  On October 6, 2018, Mr. Hurra invested approximately $100,000 in Hybrid Tokens via a wire transfer of U.S. dollars.

12. Mr. Kim is, and at all relevant times was, a citizen of the United States.  On or about March 11, 2018, Mr. Kim, on behalf of himself and BBG, invested approximately $70,000 in Hybrid Tokens via a transfer of Ether.

13. Mr. Verduzo is, and at all relevant times was, a citizen of Mexico and resident of the United States.  On or about May 17, 2017, Mr. Verduzo invested approximately $53,020 in Hybrid Tokens via a wire transfer of U.S. dollars.

14. Mr. D. Kwon is, and at all relevant times was, a citizen of the United States. Between May 25 and May 31, 2018, Mr. D. Kwon invested at least $250,000 in Hybrid Tokens via transfers of Ether.

15. Mr. J. Kwon is, and at all relevant times was, a citizen of the United States. Between May 25 and May 31, 2018, Mr. J. Kwon invested at least $250,000 in Hybrid Tokens via transfers of Ether.

16. Hybrid represents itself as, among other things, a private limited company incorporated in Hong Kong with its registered office at Room 1901, 19/F, Lee Garden One, 33 Hysan Avenue, Causeway Bay, Hong Kong.  Upon information and belief, Hybrid is an unknown business entity with its registered address at 93 Mill Street, Qormi, Malta, and doing business at, among other places, 7 Straits View, #11-01 Marina One East Tower, Singapore, 018936.

17. ADAX represents itself as, among other things, "an automated liquidity protocol that facilitates trades within the Cardano ecosystem in a completely decentralized and non-custodial way."[1]  Upon information and belief, ADAX is an unknown business entity doing business at, among other places, Kyriakou Matsi, 16 Eagle House, Nicosia, Cyprus 1082, CY.  Upon information and belief, ADAX was created by Ohno, Jao, and potentially others, for the specific purpose of serving

---

[1] *What is ADAX*, ADAX, *available at* https://adax.pro.

as a so-called "exit vehicle" through which Defendants could—and ultimately did—funnel to themselves the investment funds received from Plaintiffs and others that were intended for Hybrid.  Upon information and belief, in or about May 2019, ADAX acquired Hybrid in full or in part.  Upon information and belief, immediately thereafter, Defendants began to deactivate, disable, and otherwise remove from various websites, forums, chat rooms, and social media accounts any and all evidence of Defendants' involvement in Hybrid and the offer and sale of Hybrid Tokens.

18. Allysian is an unknown business entity that claims "[o]ur Mission is to maximize human potential through advanced science and education, enabling people to become the best at whatever they choose to be."[2]  Allysian offers and sells a variety of supplements, such as "Mastermind," which claims to be "a breakthrough cognitive support formulation made with unique, potent and proven herbal and botanical extracts from all around the world and designed to help you perform at your best."[3]  Upon information and belief, Allysian does not offer or sell any products or services related to digital tokens.  Jao and Ohno claim to be the Co-Founders of Allysian, Jao claims to be the Chief Executive Officer of Allysian, and Pugliese claims to be the Global Managing Director of Allysian.[4]  Upon information and belief, Hybrid transferred substantial portions of the $50 million to Allysian, purportedly for various disclosed and undisclosed products and services.  Upon information and belief, that money was ultimately funneled to Ohno, Jao, Pugliese, and Liu individually.

19. Ohno is the Co-Founder of Hybrid and the Co-Founder of Allysian.  Upon information and belief, Ohno is, and at all relevant times was, a citizen of the United States and a resident of, among other places, Los Angeles, California.

---

[2] *Company*, Allysian Sciences, *available at* https://www.allysian.com/about.html.
[3] *Mastermind*, Allysian Sciences, *available at* https://www.allysian.com/mastermind.html.
[4] *Company*, Allysian Sciences, *available at* https://www.allysian.com/about.html.

20. Jao is the Co-Founder of Hybrid and the Co-Founder and Chief Executive Officer of Allysian.  Upon information and belief, Jao is, and at all relevant times was, a resident of Vancouver, Canada.

21. Pugliese is the Global Managing Director of Allysian.  Upon information and belief, Pugliese is, and at all relevant times was, a citizen of the United States and a resident of the state of California.

22. Liu is the Executive Director of ADAX.  Upon information and belief, Liu is, and at all relevant times was, a resident of Orange County, California.

23. The true names and capacities (whether individual, corporate, associate, or otherwise) of the defendants sued as Does 1 through 10, inclusive, or any of them, are unknown to Plaintiffs, and Plaintiffs therefore sue said defendants, and each of them, by such fictitious names.  Once the names and capacities of said defendants are ascertained by Plaintiffs, Plaintiffs shall seek leave of Court to allege the same.  Plaintiffs are informed and believes, and on such information and belief allege, that defendants sued as Does 1 through 10, inclusive, are each responsible in some manner for the events and happenings herein referred to and are each responsible for damages to Plaintiffs as herein alleged.

## **JURISDICTION**

24. Defendants are subject to personal jurisdiction in this Court because of their numerous contacts with the State of California and the United States, both generally and specifically in connection with their involvement in Hybrid and the offer and sale of Hybrid Tokens.  Indeed, during the period beginning in or about January 2018, and ending on or about June 6, 2018, Defendants raised approximately $50 million from investors,  including many based within this District.

25. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the causes of action asserted herein arise under federal law, including Sections 5 and 12 of the Securities Act, Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5.

26. Venue is proper in this District because the acts and transactions constituting the violations alleged in this complaint occurred within this District.

27. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## **FACTUAL ALLEGATIONS**

### **A. Blockchain Technology and Digital Tokens.**

28. A blockchain is an electronic distributed ledger or list of entries—much like a stock ledger—that is maintained by various participants in a network of computers. Blockchains use cryptography to process and verify transactions on the ledger, providing comfort to users and potential users of the blockchain that entries are secure.

29. Blockchain technologies and distributed legers may be used to create and disseminate virtual "tokens" or "coins." A token or coin may entitle its holders to certain rights related to an underlying venture, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. The tokens or coins may also be traded on digital currency exchanges, in exchange for virtual or fiat currencies. As the SEC has stated, based on these rights, "in certain cases, the tokens or coins will be securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration."

30. Tokens are sold in various capital raising events in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically Bitcoin ("BTC") or Ether) or fiat currency. These tokens are issued on a blockchain and are oftentimes listed on online platforms, called cryptocurrency exchanges, where they are tradeable for virtual or fiat currencies.

*///*

31. To participate in a capital raising event, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account. During a capital raising event, or after its completion, the issuer will typically distribute its unique "tokens" or "coins" to the participants' unique address on the blockchain. Like stockholders, tokenholders and coinholders are entitled to certain rights related to the venture underlying the token or coin, such as a profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

32. Capital raising events are typically announced and promoted online, although other marketing may be employed. Issuers often release a "white paper" describing the project and promoting the capital raising event, often in highly technical terms and jargon—as discussed below, Defendants issued several white papers. To participate in the capital raising event, investors are generally required to transfer consideration to the issuer's address, bank account, digital "wallet," or other account. After the completion of the capital raising event, the issuer will distribute its tokens to the participants' unique address on the blockchain.

33. Issuers and individuals increasingly have been using blockchain technology in connection with raising capital for business and projects. And blockchain-enabled offerings are often targeted at retail investors in the United States and globally. It is reported that various blockchain technology businesses and projects raised more than $20 billion between June 2017 and November 2018.

34. After the initial sale by an issuer, tokens are sometimes transferred between users or listed on online trading platforms, which are sometimes colloquially referred to as "exchanges," whereon the tokens trade for other digital assets or fiat currencies.

**B. The Application of the Securities Laws to Digital Tokens.**

35. The definition of "security" includes a wide range of investment vehicles, including stocks, bonds, and "investment contracts." Investment contracts are transactions where an individual invests money in a common enterprise and

reasonably expects profits to be derived from the entrepreneurial or managerial efforts of others.  In a variety of circumstances, courts have found that investment vehicles other than stocks and bonds constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, airplanes, mobile phones, and enterprises existing only on the Internet.  As the Supreme Court of the United States has noted, Congress defined security broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable scheme devised by those who seek the use of the money of others on the promise of "profits."

36. The SEC has made clear that digital tokens, such as Hybrid Tokens, often constitute securities.  *See Investor Bulletin:  Initial Coin Offerings*, U.S. Securities and Exchange Commission (Jul. 25, 2017) ("[I]n certain cases, the tokens or coins will be securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration[.]").  According to the SEC, "issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption applies."  *Press Release:  SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (Jul. 25, 2017), https://www.sec.gov/new/press-release/2017-131.

37. In a number of speeches, the SEC's leadership has reinforced this view.  For example, in a November 8, 2017, speech entitled *Governance and Transparency at the Commission and in Our Markets*, Jay Clayton, then-Chairman of the SEC, stated:  "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security."  A few months later, on January 22, 2018, then-Chairman Clayton cautioned those involved in the ICO process, stating:  "My first message is simple and a bit stern.  Market professionals, especially gatekeepers, need to act responsibly and hold themselves to high standards.  To be blunt, from what I have seen recently, particularly in the initial coin offering space, they can do better."  Then-Chairman Clayton further stated:  "First, and most disturbing to me, there are

ICOs where the lawyers involved appear to be, on the one hand, assisting promoters in structuring offerings of products that have many of the key features of a securities offering, but call it an 'ICO,' which sounds pretty close to an 'IPO.'  On the other hand, those lawyers claim the products are not securities, and the promoters proceed without compliance with the securities laws, which deprives investors of the substantive and procedural investor protection requirements of our securities laws."

38. Section 5(a) of the Securities Act, 15 U.S.C. § 77e(a), provides that, unless a registration statement is in effect as to a security or an exemption from registration applies, it is unlawful for any person, directly or indirectly, to sell securities in interstate commerce.

39. Section 5(c) of the Securities Act, 15 U.S.C. § 77e(c), provides a similar prohibition against offers to sell or offers to buy, unless a registration statement has been filed or an exemption from registration applies.  Thus, Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce, absent an exemption.

40. The federal securities laws, including the Securities Act and the Exchange Act, and the regulations promulgated thereunder, require the disclosure of all material facts in connection with the offer and sale of securities.  Sections 11 and 12(a)(2) of the Securities Act, for example, prohibit material misstatements and omissions in prospectuses and registration statements, respectively, and Section 17(a) of the Securities Act generally prohibits material misstatements and omission in connection with the sale of securities.  In addition, Section 10(b) of the Securities Act and SEC Rule 10b-5 provide purchasers of securities a private right of action against all persons and entities who use deceptive devices in connection with the offer and sale of securities.

**C. The Hybrid White Paper Version 1.9.2.**

41. In or about early 2018, Defendants publicly published Version 1.9.2 of the Hybrid Block White Paper (the "White Paper 1.9.2.").

42. The White Paper 1.9.2 summarized Hybrid's aspirations as follows:

> HybridBlock is an ecosystem that brings cryptocurrency to everyday retail investors, we are focused on the individuals who are just learning about cryptocurrencies to the expert day trader looking for the most sophisticated, secure, and reliable trading tools on the planet. We want everyone in the world to have a personalized experience to buy, trade, and learn about cryptocurrency according to THEIR needs. With a focus in the high growth regions, starting in Asia.
>
> The HybridBlock ecosystem starts with BaseTrade, a platform that enables consumers the easiest way to buy, sell, and store cryptocurrencies. For more intermediate users we have HybridExchange, the best ways to transact with new digital currencies, including HybridBlock Token, Bitcoin, Ethereum, Litecoin and select other utility tokens. A more advanced option is HybridTrade, a client-side desktop application for institutional or professional traders. The entire ecosystem has been engineered from the ground up to leverage the latest technologies that will allow HybridBlock to scale to hundreds of millions of simultaneous users.
>
> Unlike any other exchange, we have a governance token that empowers all participants to work together to shape and build the future of the HybridBlock ecosystem together.

43. The White Paper 1.9.2 noted that Hybrid "operate[s] in a complex regulatory environment," but claimed that "***our expectation is to work alongside individual governments in order to obtain the necessary licensing for our operations, primarily in Southeast Asia***."

44. The White Paper 1.9.2 touted that "[o]ne of Hybrid's advantages is its established network within its target markets, primarily in Asia." According to the White Paper 1.9.2., "***HybridBlock has longstanding relationships in[sic] multiple governments and regulators responsible for crafting legislation and issuing licenses, including the Philippines, Malaysia, Labuan, Singapore, Hong Kong, Korea, Taiwan, and provincial governments of large cities in China***." In fact, according to the White Paper 1.9.2., " ***HybridBlock has already met with regulators in numerous countries to begin this process***. While government and

regulatory approval is outside of our control, we will place a strong effort into seeing approvals in target markets through to fruition.

45. The White Paper 1.9.2 claimed to have "assembled a team comprised of experienced trading system professionals from both the cryptocurrency industry and non-crypto Wall Street markets."

46. According to the White Paper 1.9.2, "[t]he HybridTerminal platform is architected with a strong focus on security." The White Paper 1.9.2. acknowledged that "[g]iven the nature of cryptographically-constructed currency and tokens, security is an important element to our long-term success" and claimed that "HybridTerminal will be hosted in Tier One datacenters and will follow all industry standard web and desktop application security best practices."

47. The White Paper 1.9.2 admitted that Hybrid Tokens would be available for purchase and sale in secondary markets, proclaiming that "Hybrid Tokens will be tradeable on Hybrid's trading platforms, and on other exchanges" and that "[h]aving Hybrid Tokens listed on multiple exchanges provides liquidity to the market."

48. The White Paper 1.9.2 explained that the funds raised from the sale of Hybrid Tokens would be used as follows:

- **53% - Pre-Sale and Open Token Sale** – HybridBlock has already received investment from strategic partners in order to begin the development of our ecosystem and specifically our HybridTerminal platforms. Tokens will be sold via DART for the Pre-Sale, followed by a public crowd sale.
- **27% - Team and Advisors** – This pool will also account for the founding team and advisors.
- **20% - Marketing, Bounty and Strategic Partnerships** – The marketing pool will be used to increase awareness of our products and ecosystem. A minimum of 2% of the token pool will be applied to the "Bounty Program". Bounty tokens will be held in reserve to incentivize bug bounties for the HybridBlock smart contract to find potential bugs.

///

49. The White Paper 1.9.2 further proclaimed that "[m]ultiple multi-signature Trezor hardware wallets for cold storage of tokens and funds raised during sale will be used to mitigate the risk of loss of funds raised."

**D. The Hybrid White Paper Version 2.0.**

50. On or about April 20, 2018, Defendants publicly published Version 2.0 of the Hybrid Block Official Whitepaper (the "White Paper 2.0").

51. The White Paper 2.0 summarized Hybrid's aspirations as follows:

> We stand at the edge of a precipice. While the world-at-large isn't fully aware yet, people close to the blockchain community can feel the pending revolution. But this isn't a sad revolution. It's a joyous one.
>
> Throughout human history, we've seen the baton of power seized by distinct players across the shifting eras of our evolution. From churches, to monarchs, to banks, to corporations, and now—to the 'collective individual.'
>
> Never before has there been a system that can fuel independent power, someone ironically, through the consensus of strangers who are all part of the same grand, decentralized ecosystem. Never before has the prospect of borderless banking for the billions of unbanked people in third-world countries been a potential reality. But here we are at the precipice, staring at the opportunity across the chasm.
>
> Any paradigm-shifting revolution takes time, and comes with seemingly insurmountable hurdles to overcome. How do we educate the world to bring them past the fear of hackers and the dark web? How do we, from a technology perspective, responsibly scale a system with no central leader? How do we enable the poor farmer in Africa to instantly and freely receive currency from his son in South America, while also allowing big corporations to adopt the technology at an enterprise scale?
>
> These questions are already being addressed and answered by an army of blockchain enthusiasts. The community is hard at work, building a bridge to cross the canyon. And we're excited to say that HybridBlock is playing a critical role in forming the foundation of that bridge.
>
> HybridBlock is building an ecosystem that seeks to bring 100 million new people into the blockchain network over the next three years.

We're mapping out our lofty goals and partnering with the smartest people on the planet to execute our vision.

Our education platform, HybridCentral, will onboard new folks from around the globe into the blockchain economy. In parallel, our all-in-one trading ecosystem will bring a full suite of trading tools to blockchain's burgeoning infrastructure, serving beginners (BaseTrade), intermediate traders (HybridExchange), and professionals (HybridTerminal).

With former Olympic champions, investment bankers, Wall Street quants, and Whitehouse [sic] officials forming our core team, we are poised and ready to bring our society into a new era of global freedom. If you can see the precipice in front of you, and want us all to land safely on the other side, you should consider supporting HybridBlock. We invite you to become an active participant in our story, and to be among the first pioneers to cross the bridge.

52. The White Paper 2.0 claimed to either have or be building numerous proprietary products, including, but not limited to:

- BaseTrade: "An easy-to-use cryptocurrency platform, where you can buy and sell, along with an exchange and wallet with funding options tailored to each country in which we operate."
- HybridExchange: "Our consumer platform, which will allow traders to provide liquidity to our target markets. This platform will provide a full order book in designated markets and currency pairs, as well as provide traders with access to third party cryptocurrency exchanges within a single interface. Our focus is to optimize liquidity being offered on our platform."
- HybridTerminal: "In addition to our web client, we are working to release a desktop trading terminal that connects to ours and our partner's APIs. Please note that HybridTerminal is scheduled to be released two months after BaseTrade and HybridExchange."
- HybridWallet: "HybridWallet is being built as a free, open source mobile wallet for storing and transacting Hybrid Block Tokens according to the Ethereum ERC20 standard. Additionally, it will be able to store a fiat-currency backed token called HybridFX (HFXs). HybridWallet is a client-side interface that interacts with the Ethereum blockchain. Once downloaded onto a user's cell phone, he or she can easily receive, store and send HybridBlock$^{TM}$ Tokens or HFXs of any supported fiat currency. While the wallet is fundamentally a

cryptocurrency wallet, the HybridWallet™ application has the ability to act as an alternative to a bank account for anyone globally."

- HybridFX: "HybridFX enables the creation of digital tokens backed by fiat currency.  These fiat-backed tokens provide individuals and organizations with a robust and decentralized method of exchanging value while using a familiar unit of accounting.  Blockchain plays a vital role in this technology, providing an auditable and cryptographically secure global ledger.  Asset-backed token issuers and other market participants can take advantage of blockchain technology, along with embedded consensus systems, to transact in familiar, less volatile currencies and assets."

53. The White Paper 2.0 touted that (i) "[o]ne of Hybrid's advantages is its established network within its target markets, primarily in Asia," (ii) "HybridBlock has longstanding relationships with multiple governments and industry regulators, including the Philippines, Malaysia, Labuan, Singapore, Hong Kong, Korea, Taiwan, and provincial governments of large cities in China," and (iii) "HybridBlock has already met with regulators in numerous countries to ensure that we are compliant with current laws and regulations and will continue to do so in the future."

54. The White Paper 2.0 marketed and sold Hybrid Tokens and, notably, touted the secondary market for Hybrid Tokens:

> HybridBlock has created the Hybrid token, which plays a pivotal role in the functioning of Hybrid-Network.  Additionally, HybridToken owners will receive, discounted fees, exclusive access to new products and services, and opportunities to invest in future ICO/Token Sales that HybridBlock will launch.
> Hybrid Tokens serve three primary functions:
> 1. Payment of transaction fees and for all services within our blockchain network
> 2. To provide exclusive access to specialized products and services
> 3. *As a tradable cryptocurrency token available on the open market*

55. According to the White Paper 2.0, Hybrid Tokens would be allocated as follows:

- 3% - Pre-Sale and Open Token Sale - HybridBlock has already received investment from strategic partners in order to begin the

development of our ecosystem and specifically our HybridTerminal platforms. Tokens will be sold via DART for the Pre-Sale, followed by a public crowd sale.

- 27% - Team and Advisors - This pool will also account for the founding team and advisors.

- 20% - Marketing, Bounty and Strategic Partnerships - The marketing pool will be used to increase awareness of our products and ecosystem. A minimum of 2% of the total token pool will be applied to the "Bounty Program". Bounty tokens will be held in reserve to incentivize bug bounties for the HybridBlock smart contract to find potential bugs.

56. The White Paper 2.0 explained that "[t]he Open Token Sale (OTS) will be done through the issuance of HybridBlock$^{TM}$ tokens generated by an ERC 20 Smart Contract via the Ethereum network on May 23 2018," "[t]he pricing for the Hybrid-Block$^{TM}$ Tokens in the OTS will be at \$0.30USD per Token in ETH or BTC based on ETH/USD or BTC/ USD time stamped price of ETH or BTC at time of arrival in the official HybridBlock ETH or BTC wallet addresses," and that because "[t]okens will be distributed through the HybridExchange$^{TM}$ platform on the date of token distribution" there would be "*a gateway to immediate trading on our platform*."

57. According to the White Paper 2.0, the funds raised from the sale of Hybrid Tokens would be allocated as follows:

1. Exchange-based Liquidity (40%)
2. Product Development (30%)
3. Strategic Partnerships (10%)
4. Operations (10%)
5. Legal & Regulations (10%)

58. According to the White Paper 2.0, the Hybrid project would be developed along the following schedule:

- R&D – March 2017
- HybridBlock$^{TM}$ Concept – May 2017
- Whitepaper Draft – July 1, 2017
- Website Launch – July 7, 2017
- HybridBlock Press Conference, Hong Kong – September 28, 2017

- HybridBlock Pre-Launch Conference, Penang, Malaysia – October 14, 2017
- HybridBlock Pre-Launch Conference, Macau – October 24, 2017
- Official Whitepaper Release – November 15, 2017
- HybridCentral™ Beta – December 1, 2017
- Hybrid Summit 2017, Macau – December 4, 2017
- Token Pre-Sale – January 15, 2018
- Hybrid Forum Manila, Philippines – January 20, 2018
- Hybrid Forum Kuala Lumpur, Malaysia – January 28, 2018
- Open Token Sale (Public) – May 23 2018
- BaseTrade™ Beta & HybridExchange™ Beta – May 2018
- HybridTerminal™ Beta, HybridFx™ Product Launch – September 2018

59.     The White Paper 2.0 touted Hybrid's well-known "Advisors," including Reeve Collins, the co-founder and CEO of Tether.

## E. The Hybrid White Paper Version 2.0.

60.     On or about May 20, 2018, Defendants published Version 2.0 of the Hybrid Block Official Whitepaper (the "May White Paper 2.0" and, together with the White Paper 1.9.2 and White Paper 2.0, the "White Papers"). The May White Paper 2.0 reiterated the same claims made in the White Paper 2.0.

## F. Defendants Knew the Statements in the White Papers Were False and Misleading.

61.     Defendants possessed the power and authority to control the contents of Hybrid's statements, including the statements in the White Papers.

62.     Defendants knew the statements in the White Papers contained material misrepresentations and omissions, but did nothing to correct said material misrepresentations and omissions, and in fact assisted in further disseminating said material misrepresentations and omissions.

## G.     Hybrid Tokens Are Securities.

63.     To determine whether an instrument is an investment contract, or security, for purposes of the federal securities laws, courts apply the test announced

in *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"). Pursuant to the so-called *Howey* test, an investment contract, or security, is defined as "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."

64. On April 3, 2019, the SEC released a detailed Framework to analyze digital assets under the *Howey* test (the "SEC Framework").

65. As discussed below, Hybrid Tokens are investment contracts and therefore securities because they constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

**1. Hybrid Token Purchasers Invested Money.**

66. Plaintiffs and other investors made an investment of money or other valuable consideration for purposes of *Howey*.

67. The SEC Framework states that "[t]he first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

68. Plaintiffs and other investors invested U.S. Dollars and digital currencies, such as Bitcoin and Ether, to purchase Hybrid Tokens.

**2. Hybrid Token Investors Participated in a Common Enterprise.**

69. Plaintiffs invested money or other valuable consideration into a common enterprise for purposes of *Howey*.

70. The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists." This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

71. Hybrid Tokens are no different, and involve a common enterprise as demonstrated by the presence of both horizontal and vertical commonality.

72.     Plaintiffs and other investors were passive participants in the offer and sale of Hybrid Tokens.  The fortunes of investors, like Plaintiffs, are tied to one another through pooled assets and pro-rata distribution of profits and interwoven with and dependent on the efforts and fortunes of Defendants.  Indeed, Hybrid was responsible for supporting Hybrid Tokens, pooled Plaintiffs' and other investors' assets, and controlled those assets.  Hybrid also retained a significant stake in Hybrid Tokens, thus sharing in the profits and risk of the venture.

### 3. Hybrid Token Investors Purchased the Tokens with a Reasonable Expectation of Profit Therefrom.

73.     Plaintiffs were led to expect and did reasonably expect a profit from their investment of money or other valuable consideration for purposes of *Howey*.

74.     With respect to Plaintiffs' and other investors' "reasonable expectation of profits," the SEC Framework explains that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

75.     According to the SEC Framework, there is likely to be a "reasonable expectation of profits" where:

- The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
- The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
- This also can be the case where the digital asset gives the holder rights to dividends or distributions.
- The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.

- Purchasers reasonably would expect that an [Active Participant's ("AP's")] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

- The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.

- The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

- o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.
- o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.
- o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.
- o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.
- o The ready transferability of the digital asset is a key selling feature.
- o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.
- o The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

76. Investors in Hybrid Tokens, including Plaintiffs, made their investment with a reasonable expectation of profits.

77. Hybrid Tokens were sold to Plaintiffs and other investors prior to a network or ecosystem on which they could be used being fully developed.

78. Moreover, as explained above, investors in Hybrid Tokens, including Plaintiffs, were led to believe by Defendants that Hybrid Tokens would be traded on secondary markets.

**4.    Investors Expected Profits from Hybrid Tokens to be Derived from the Managerial Efforts of Others.**

79. Plaintiffs' expectation of profits from their investment was dependent and reliant upon the managerial efforts of others for purposes of *Howey*.

80. The SEC Framework explains that the "inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:  Does the purchaser reasonably expect to rely on the efforts of an [AP]?  Are those efforts 'the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise,' as opposed to efforts that are more ministerial in nature?"

81. The presence of the following characteristics makes it "more likely it is that a purchaser of a digital asset is relying on 'the efforts of others'":

- An AP is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

  - Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset.  This can include, for example, an AP that:  (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.
- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:
  - Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.
  - Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.
  - Determining who will receive additional digital assets and under what conditions.
  - Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.
  - Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.
  - Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.
- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

- o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.
- o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.
- o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.
- o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

82.     The SEC Framework also notes that "[a]lthough no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:"

- The distributed ledger network and digital asset are fully developed and operational.
- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.
- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services. Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

///

///

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

83.    Purchasers of pre-functional tokens, such as Hybrid Tokens, necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price—that is, until such tokens transition into being functional utility tokens.  Hybrid Tokens were securities at issuance because profits from Hybrid Tokens would be derived primarily from the managerial efforts of Defendants in developing the associated network on which Hybrid Tokens would function, rather than having its profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold.

84.    Hybrid Tokens satisfy most if not all of the factors the SEC described as relevant to its determination whether a digital asset is a security for purposes of the *Howey* test.  Defendants created Hybrid Tokens from thin air.  Defendants represented that they would develop an ecosystem that would increase the value of Hybrid Tokens.  Plaintiffs reasonably expected Defendants to provide significant managerial efforts to develop and improve the Hybrid Token ecosystem, to develop

and sustain a supportive network, and to secure listing at exchanges through which Hybrid Tokens could be traded or liquidated.  Defendants represented that they would provide significant managerial efforts to achieve these objectives and make Hybrid Tokens a success.

85.   Defendants attempt to distort the truth by calling Hybrid Tokens "utility tokens."  The artifice of this terminology had its clear genesis in a report the SEC published on July 25, 2017, regarding the DAO Initial Coin Offering, which involved DAO Tokens being offered in exchange for ETH investments (the "DAO Report").  In the DAO Report, the SEC concluded that the DAO Tokens were securities.  Shortly after the SEC published the DAO Report, on October 2, 2017, a trio of attorneys published a whitepaper entitled "The SAFT Project: Toward a Compliant Token Sale Framework" (the "SAFT Project Whitepaper").[5]  The SAFT Project Whitepaper explained that it's focus was on "so-called 'utility tokens,'" which it described as a "category of blockchain tokens contains assets that do not purport to replace legacy financial services products.  They are designed to offer intrinsic utility that powers a decentralized, distributed network that delivers to the users of the network a consumptive good or service." [6]  The SAFT Project Whitepaper explained that "[t]he DAO Token was not a utility token, and the SEC did not speak on utility tokens specifically," and claimed that "utility tokens now make up a significant proportion of aggregate token offerings. . . ." [7]  As explained herein, however, Defendants' use of the nomenclature "utility tokens" does not alter

---

[5] *The SAFT Project: Toward a Compliant Token Sale Framework*, Juan Batiz-Benet, Marco Santori, Jesse Clayburgh, COOLEY (Oct. 2, 2017), *available at* https://www.cooley.com/-/media/cooley/pdf/reprints/saft-project-whitepaper.ashx.
[6] *The SAFT Project: Toward a Compliant Token Sale Framework*, Juan Batiz-Benet, Marco Santori, Jesse Clayburgh, COOLEY (Oct. 2, 2017), *available at* https://www.cooley.com/-/media/cooley/pdf/reprints/saft-project-whitepaper.ashx.
[7] *The SAFT Project: Toward a Compliant Token Sale Framework*, Juan Batiz-Benet, Marco Santori, Jesse Clayburgh, COOLEY (Oct. 2, 2017), *available at* https://www.cooley.com/-/media/cooley/pdf/reprints/saft-project-whitepaper.ashx.

or negate the fact Hybrid Tokens are investment contracts pursuant to the *Howey* test, and therefore securities for purposes of the federal securities laws.

86.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic reality is that the offer and sale of Hybrid Tokens was an offer and sale of securities.  Indeed, Plaintiffs invested cryptocurrency and fiat currency in order to receive Hybrid Tokens, which they were conditioned to expect would be worth more than their initial cryptocurrency investments.

87.     Defendants also made it clear that the purpose of the sale of Hybrid Tokens was to raise capital to finance the development of the Hybrid project. Defendants sold approximately $50 million of Hybrid Tokens to private investors.

88.     Defendants themselves recognized, both implicitly and explicitly, that purchasers of Hybrid Tokens have a reasonable expectation of profit.

89.     Additionally, the contributions received from investors were being pooled and managed by Defendants to fund projects that would increase the adoption of the Hybrid platform, thereby increasing the value of Hybrid Tokens.

90.     Investors have entirely passive roles vis-à-vis the success of the Hybrid project and Hybrid Tokens.  The success of the Hybrid project, and the profits reasonably expected by Plaintiffs to be derived from the Hybrid Project, are dependent solely on the technical, entrepreneurial, and managerial efforts of Defendants and their agents and employees.

91.     From the outset, Defendants were responsible for developing the Hybrid platform, establishing the Hybrid platform, and choosing directors, managers, and all persons critical to Hybrid's success.  Plaintiffs reasonably expected Defendants to provide significant managerial efforts, to develop and complete the Hybrid platform, to develop and sustain Apps and a supportive network after its launch, and to create exchanges through which Hybrid Tokens could be traded or liquidated.  Through their conduct and marketing materials,

Defendants repeatedly represented that they would be relied upon to provide the significant managerial efforts required to achieve these objective and make Hybrid a success.

92.     Although Defendants characterized Hybrid Tokens as "utility tokens" in the White Paper, these tokens did not have any functionality at the time of the ICO.

**H. Defendants' Solicitation of United States Investors and Funds.**

93.     Defendants did not register their offer and sale of Hybrid Tokens with the SEC.  As such, Defendants were prohibited from offering for sale or selling Hybrid Tokens to United States based investors, absent an applicable exemption. However, as described herein, Defendants knowingly and willfully ignored that prohibition and offered for sale and sold Hybrid Token to United States based investors, including Plaintiffs.

94.     For example, as shown in the below image, on October 12, 2017, Defendants Apolo Ohno and Rod Jao met and dined with several United States based investors, including Herman Seo, Ohno, Jao, Kang, Ryan Lee, Jeff Dubinsky ("Mr. Dubinsky"), Hen Tekle ("Mr. Tekle"), Ugo Nduguba, Ian Balina, J. Kwon,



and Liam Murphy, at a restaurant named Park's BBQ located at 955 S. Vermont Ave, Ste. G, Los Angeles, California 90006 (the "Dinner").

95.     The Dinner was intended to be, and was in fact, a means of recruiting employees and investments.  Indeed, following the Dinner, (i) Mr. Dubinski was named a Vice President of Hybrid, (ii) Mr. Tekle became an advisor to and investor in Hybrid, (iii) and Mr. Kwon became an investor to Hybrid.

96.     In addition, Defendants vigorously marketed Hybrid Tokens and the ICO through their Twitter account, viewable by consumers around the world, in the United States and elsewhere.   None of Defendants' Tweets mentioned any prohibition on United States investors.

97.     To provide just a few examples:

(i)     On February 6, Hybrid proclaimed that "HybridBlock consists of an ecosystem that leverages the power of []cryptocurrency" and provided a link for prospective investors to "[d]ownload our []Whitepaper[.]"[8]

(ii)    On March 13, 2018, Hybrid announced it had raised more than $40 million U.S. dollars and wrote that "[w]e want to give a huge thank you in the community as we couldn't have had such a successful pre-sale raise without each and every one of you."[9]

(iii)   On March 21, 2018, Hybrid retweeted an article from Fox Business with the headline "Life after Olympics:  Apolo Ohno seeks to Launch $50M blockchain platform."[10]

---

[8]   Hybrid   (@HybridBlock HQ),   Twitter   (Feb.   6,   2018,   8:56   A.M.), https://twitter.com/HybridBlockHQ/status/960920025568702464.
[9]   Hybrid   (@HybridBlock HQ),   Twitter   (Mar.   13,   2018,   8:01   A.M.), https://twitter.com/HybridBlockHQ/status/973574734897188864.
[10]   Hybrid   (@HybridBlock HQ),   Twitter   (Mar.   21,   2018,   8:38   P.M.), https://twitter.com/HybridBlockHQ/status/976664273748480000.

(iv)   On April 29, 2018, Hybrid invited prospective investors to "REGISTER FOR THE []HYBRIDBLOCK []TOKENSALE."[11]

(v)   On May 20, 2018, Hybrid reminded investors that "[t]he public sale will commence on May 23, 2018 through the 30th."[12]

(vi)   On May 23, 2018, Hybrid announced that the "HybridBlock Public Sale is almost LIVE!" and provided pertinent details, including, but not limited to, the "OTS Start Date:  May 23rd," the "OTS Closing Date:   June 6th," the "OTS Start Time:   12pm CEST," the "Minimum Contribution:   0.25 ETH," and the "OTS Price: $0.30/HYB."[13]

(vii)   On June 3, 2018, Hybrid Tweeted that "[]HybridBlock is the best []ICO to invest right now." [14]

98.   Upon information and belief, despite raising tens of millions of dollars, Hybrid did not have its own bank accounts; rather, the funds raised from investors, including Plaintiffs, were held by Allysian.

## I.  The "Theft" and Defendants' Cover-Up.

99.   Upon information and belief, Defendants squandered and/or misappropriated all or nearly all of the approximately $50 million raised through the offer and sale of Hybrid Tokens.

100.   Rather than inform investors that their investments had been squandered and/or misappropriated, Defendants claimed that on August 7-8, 2018, Hybrid's electronic wallets were breached and approximately 11,000 ETH in

---

[11]   Hybrid (@HybridBlock HQ), Twitter (Apr. 29, 2018, 6:16 P.M.), https://twitter.com/HybridBlockHQ/status/990761664273420288.

[12]   Hybrid (@HybridBlock HQ), Twitter (May 20, 2018, 10:27 A.M.), https://twitter.com/HybridBlockHQ/status/998253848161595392.

[13]   Hybrid (@HybridBlock HQ), Twitter (May 23, 2018, 12:40 A.M.), https://twitter.com/HybridBlockHQ/status/999193348660449280.

[14]   Hybrid (@HybridBlock HQ), Twitter (Jun. 3, 2018, 11:15 A.M.), https://twitter.com/HybridBlockHQ/status/1003339452683571201.

cryptocurrency, worth approximately $4,400,000.00 at the time, was stolen (the "Breach").

101.    Defendants did nothing in response to the Breach.  Indeed, Defendants neither disclosed the breach to insiders *or* investors, nor took any affirmative action to investigate the Breach or recover the approximately 11,000 ETH in cryptocurrency purportedly stolen in the Breach.

102.    Ultimately, however, in or about September 2018, after Mr. Kang made numerous inquiries concerning Hybrid's business operations and plans, Pugliese informed Mr. Kang of the Breach and insisted that Defendants take action. At Mr. Kang's insistence, Hybrid retained CipherBlade Ltd. ("CipherBlade"), an electronic asset security firm, to investigate the Breach.

103.    On March 9, 2019, CipherBlade published a report entitled *Blockchain Analysis of HybridBlock Breached Funds* (the "CipherBlade Report").

104.    The CipherBlade Report highlights Defendants' refusal to assist and attempts to impede CipherBlade's investigation of the Breach, including by (i) failing to provide certain backup devices, (ii) failing to provide complete screenshots, chat logs, and login histories of suspect accounts; and (iii) failing to timely prepare and provide an incident report for the Breach, and belatedly providing an incomplete and misleading incident report for the Breach.

105.    The CipherBlade Report further explained that Defendants (i) failed to conduct appropriate General Data Protection Regulation ("GDPR") actions in response to the Breach, (ii) failed to notify investors of the Breach, (iii) failed to notify law enforcement of the Breach,

106.    In addition, the CipherBlade Report noted that certain Hybrid employees informed CipherBlade that, in reckless disregard of proper security protocols, and in direct contradiction of its representation in the White Papers, Hybrid stored approximately $20,000,000 of investor funds in TUSD, on a wallet on a computer.

107.    Finally, the CipherBlade reported noted that Hybrid had "very little to show" for the approximately $50 million in investor funds raised.

**J.  The Final Product.**

108.    In or about July 2018, Hybrid released a simulation of its platform at www.hybex.net ("Hybex Net").

109.    Shortly thereafter, Hybrid released www.hybex.io in full ("Hybex IO"). Hybex IO was virtually indistinguishable from Hybex Net.

110.    A cursory review of the code underpinning Hybex IO revealed that, contrary to Defendants' representations that Hybrid was designing a new, novel, and groundbreaking platform, Hybex IO was instead a so-called "white label exchange" purchased from software company AlphaPoint.

111.    AlphaPoint describes itself thusly:  "AlphaPoint is a white-label software company powering crypto exchanges worldwide. Through its secure, scalable, and customizable distributed ledger platform, AlphaPoint enables customers to launch and operate markets, as well as digitize assets. AlphaPoint and its award winning blockchain technology have helped over 150 clients in 35 countries discover and execute their blockchain strategies since 2013."[15]

112.    Upon information and belief, as Defendants had planned all along, in or about May 2019, ADAX—a company created by Ohno, Jao, and potentially others—acquired Hybrid in full or in part.

113.    On May 9, 2019, Defendants sent investors, including Plaintiffs, an email stating "[w]e are extremely excited to announce that portions of HybridBlock's ecosystem have been acquired by Asia Digital Asset Exchange (ADAX) - a fully licensed asset backed token issuance and exchange platform in Asia" and advising investors, including Plaintiffs, that "BaseTrade, our fiat to cryptocurrency platform, some of the HybridBlock team, and HybridBlock Token

---

[15]    *See* AlphaPoint, LINKEDIN, *available at* https://www.linkedin.com/company/alpha-point/.

(HYB) will all be integrated into ADAX in the coming months," that "[o]nce integration is complete, HybridBlock will discontinue separate exchange services," and that "ADAX is the new home for HybridBlock!"

114.    Upon information and belief, immediately thereafter, Defendants began to Defendants began to deactivate, disable, and otherwise remove from various websites, forums, chat rooms, and social media accounts any and all evidence of Defendants' involvement in Hybrid and the offer and sale of Hybrid Tokens.

115.    Upon information and belief, Defendants, and each of them, misused, squandered, and even claim to have lost by theft substantial portions of the monies raised through their sale of Hybrid Tokens, and, to date, have yet to satisfy *any* of the many commitments they made to investors described herein.

116.    In an effort to avoid regulatory scrutiny, when one United States-based investor complained of Defendants' conduct and threatened to initiate legal action, Defendants offered that investor a full reimbursement of her investment.[16]

## **FIRST CAUSE OF ACTION**

### **SALE OF UNREGISTERED SECURITIES**

### **Sections 5 and 12(a)(1) of the Securities Act**

### **(Against Hybrid)**

117.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

118.    Section 5(a) of the Securities Act states:  "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through

---

[16]    That transaction is recorded at https://etherscan.io/tx/0x22ee3fd2961ff7a7f9e7e5d6ec2e2afdce052b5dc5bd9e3f73 ef1f642138b28c.

the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

119.   Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id*. § 77e(c).

120.   When issued, Hybrid Tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1). Defendants promoted, solicited, or sold Hybrid Tokens to Plaintiffs and others. Defendants thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale. No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

121.   Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." *Id*. § 77l(a)(1).

122.     Accordingly, Defendants have violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77l(a)(1).

123.     Plaintiffs seek rescissory damages and/or compensatory damages with respect to purchases of Hybrid Tokens to the extent permitted by law.

124.     This claim is brought pursuant to Section 12(a)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 77l(a)(1).

**SECOND CAUSE OF ACTION**

**SALE OF UNREGISTERED SECURITIES**

**Sections 5 and 12(a)(2) of the Securities Exchange Act of 1934**

**(Against Hybrid)**

125.     Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

126.     Section 12(a)(2) of the Securities Act provides in relevant part: "Any person who offers or sells a security … by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security" *Id.* § 77l(a)(2).

127.     When issued, Hybrid Tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).  Defendants offered,

promoted, solicited, or sold purchases of Hybrid Tokens from Plaintiffs and others by means of a prospectus. The prospectus consists of Defendants' whitepapers issued prior to their offer and sale of Hybrid Tokens.

128. The statements included in the prospectus were false and/or omitted material facts necessary in order to make the statements, in light of the circumstances of which they were made, not misleading.

129. This Count does not allege fraud. For the purposes of asserting this claim, Plaintiffs do not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent, except as to any statements of opinion or belief.

130. Defendants directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

131. Accordingly, Defendants violated Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2).

132. Plaintiffs and the Class seek rescissory damages with respect to purchases of Hybrid Tokens.

<u>**THIRD CAUSE OF ACTION**</u>

**CONTROL PERSON LIABILITY**

**Section 15 of the Securities Act**

**(Against Ohno and Jao)**

133. Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

134. This count is brought pursuant to Section 15 of the Securities Act.

135. Due to their ownership interest in and control over Hybrid, Ohno and Jao acted as controlling persons of Hybrid within the meaning of Section 15 of the Securities Act. By virtue of their positions as Co-Founders of Hybrid and their participation in and/or awareness of Hybrid's operations, Ohno and Jao had the

power to influence and control, and did influence and control, directly or indirectly, the decision-making relating to the sale of Hybrid Tokens and the failure to register these sales.

136.   By virtue of the foregoing, Ohno and Jao are liable to Plaintiffs as control persons under Section 15 of the Securities Act.

137.   As such, Hybrid, Ohno, and Jao have participated in an unregistered sale of securities in violation of the Securities Act and are liable to Plaintiffs for rescission and/or compensatory damages.

## FOURTH CAUSE OF ACTION
### SECURITIES FRAUD
**Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5**
**(Against All Defendants)**

138.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

139.   Between approximately January 2018 and June 6, 2018, Defendants offered and sold approximately $50 million worth of securities to investors based around the world, including Plaintiffs.

140.   In connection with the aforementioned sales, Defendants made statements (a) that were false representations of material facts to Plaintiffs, (b) that Defendants knew to be false or were made recklessly and without regard for their truth, (c) that Defendants intended Plaintiffs to rely upon, (d) that Plaintiffs did reasonably rely upon, (e) that Plaintiffs' reliance upon was a substantial factor in causing damage to Plaintiffs, and (f) that caused damages to Plaintiffs as described above.

141.   Defendants misrepresented, among other things, the nature and development of Hybrid's platform and the use and disposition of investor funds.

142.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(viii)    Employed devices, schemes, and artifices to defraud;

(ix)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(x)    Engaged in acts, practices, and a course of business that operates as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Hybrid Tokens between approximately January 2018 and June 6, 2018.

143.    Plaintiffs and others did justifiably rely on Defendants' misrepresentations to Plaintiffs and others that they could and would satisfy these obligations.

144.    By justifiably relying on Defendants' misrepresentations, Plaintiffs and others have been damaged.

## FIFTH CAUSE OF ACTION

### CONTROL PERSON LIABILITY

### Section 20(a) of the Exchange Act

### (Against Ohno and Jao)

145.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

146.    This count is brought pursuant to Section 20(a) of the Exchange Act.

147.    Due to their ownership interest in and control over Hybrid, Ohno and Jao acted as controlling persons of Hybrid within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions as Co-Founders of Hybrid and their participation in and/or awareness of Hybrid's operations, Ohno and Jao had the power to influence and control, and did influence and control, directly or indirectly,

the decision-making relating to the sale of Hybrid Tokens and the material misstatements and omissions made in connection therewith.

148.   By virtue of the foregoing, Ohno and Jao are liable to Plaintiffs as control persons under Section 20(a) of the Exchange Act.

### SIXTH CAUSE OF ACTION

### INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

149.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

150.   Defendants made statements (a) that were false representations of material facts to Plaintiffs, (b) that Defendants knew to be false or were made recklessly and without regard for their truth, (c) that Defendants intended Plaintiffs to rely upon, (d) that Plaintiffs did reasonably rely upon, (e) that Plaintiffs' reliance upon was a substantial factor in causing damage to Plaintiffs, and (f) that caused damages to Plaintiffs as described above.

151.   Defendants misrepresented, among other things, the nature and development of Hybrid's platform and the use and disposition of investor funds.

152.   Defendants knew or should have known that they could not and would not satisfy their obligations relating to the nature and development of Hybrid's platform and the use and disposition of investor funds.

153.   Defendants represented to Plaintiffs and others that they could and would satisfy these obligations.

154.   Plaintiffs and others did justifiably rely on Defendants' misrepresentations to Plaintiffs and others that they could and would satisfy these obligations.

155.   By justifiably relying on Defendants' misrepresentations, Plaintiffs and others have been damaged.

///

## SEVENTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

#### (Against All Defendants)

156.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

157.   Defendants made statements (a) that were false representations of material facts to Plaintiffs, (b) that Defendants knew to be false or were made recklessly and without regard for their truth, (c) that Defendants intended Plaintiffs to rely upon, (d) that Plaintiffs did reasonably rely upon, (e) that Plaintiffs' reliance upon was a substantial factor in causing damage to Plaintiffs, and (f) that caused damages to Plaintiffs as described above.

///

158.   Defendants misrepresented, among other things, the nature and development of Hybrid's platform and the use and disposition of investor funds.

159.   Defendants knew or should have known that they could not and would not satisfy these obligations.

160.   Defendants represented to Plaintiffs and others that they could and would satisfy these obligations.

161.   Plaintiffs and others did justifiably rely on Defendants' misrepresentations to Plaintiffs and others that they could and would satisfy these obligations.

162.   By justifiably relying on Defendants' misrepresentations, Plaintiffs and others have been damaged.

## EIGHTH CAUSE OF ACTION

### BREACH OF CONTRACT

#### (Against All Defendants)

163.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

164.    Plaintiffs and Defendants entered into a contract, the terms of which are evidenced by the White Papers.

165.    Plaintiffs performed all of the things required of them, namely, making payments of U.S. Dollars and digital currencies.

166.    Defendants failed to perform, and were not excused from performing, all or substantially all of the things required of them.

167.    As a result of Defendants' failure to perform, Plaintiffs have been harmed.

168.    Defendants' failure to perform was a substantial factor in causing Plaintiffs' harm.

## NINTH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF

### GOOD FAITH & FAIR DEALING

**(Against All Defendants)**

169.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

170.    Plaintiffs and Defendants entered into a contract, the terms of which are evidenced by the White Papers.

171.    Plaintiffs performed all of the things required of them, namely, making payments of U.S. Dollars and digital currencies.

172.    Defendants failed to perform, and were not excused from performing, all or substantially all of the things required of them.

173.    By failing to perform, Defendants did not act fairly and in good faith.

174.    As a result of Defendants' conduct, Plaintiffs have been harmed.

175.    Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

///

///

## <u>TENTH CAUSE OF ACTION</u>

## MONEY HAD AND RECEIVED

## (Against All Defendants)

176.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein

177.   Defendants received money from Plaintiffs that was intended to be used for the benefit of Hybrid and the Hybrid investors, including Plaintiffs.

178.   Defendants did not use the money for the benefit of Hybrid and the Hybrid investors, including Plaintiffs

179.   Defendants have not returned to Plaintiffs any of the money they received from Plaintiffs that was intended to be used for the benefit of Hybrid and the Hybrid investors, including Plaintiffs, despite not so using the money.

180.   Plaintiffs seek compensatory and punitive damages.

## <u>ELEVENTH CAUSE OF ACTION</u>

## PROMISSORY FRAUD

## (Against All Defendants)

181.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

182.   Defendants made promises (a) that were false representations of material facts to Plaintiffs, (b) that Defendants knew to be false or were made recklessly and without regard for their truth, (c) that Defendants intended Plaintiffs to rely upon, (d) that Plaintiffs did reasonably rely upon, (e) that Plaintiffs' reliance upon was a substantial factor in causing damage to Plaintiffs, and (f) that caused damages to Plaintiffs as described above.

///

///

///

///

## TWELFTH CAUSE OF ACTION

### UNJUST ENRICHMENT

#### (Against All Defendants)

183.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

184.   Defendants have wrongfully received and are withholding property and profits which rightfully belong to Plaintiffs.

185.   Defendants have not filed any accounting to account for and/or pay to Plaintiff the value of the property and profits derived therefrom.

186.   As a result of Defendants' unlawful acts and omissions, Defendants have been unjustly enriched to Plaintiffs' detriment.

187.   Plaintiffs therefore demand restitution and judgment against Defendants in an amount to be determined at trial, together with interest, attorneys' fees, and costs.

## THIRTEENTH CAUSE OF ACTION

### FRAUDULENT CONVEYANCE

#### (Against All Defendants)

188.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

189.   Pursuant to California's Uniform Fraudulent Transfer Act, Civil Code §§ 3409.04, *et seq.*, Plaintiffs are informed and believe, and thereon allege, that Defendants, directly or indirectly, transferred, or caused to be transferred, certain funds raised from Plaintiffs' purchase of Hybrid Tokens from Hybrid to Allysian with the purpose of frustrating, hindering, delaying, or defrauding Plaintiffs. Accordingly, such conveyances to Allysian should be set aside.

190.   To the extent any funds raised from Plaintiffs are still held or controlled by Defendants, a constructive trust should be placed on such funds, the conveyance of such funds should be declared null and void, and such funds should

be paid over and returned to Plaintiffs, or, in the alternative, Defendants should be liable to Plaintiffs in an amount to be established at trial, subject to proof, but in an amount no less than $1,500,000.00.

191.    Plaintiffs are informed and believe, and thereon allege, that in performing the acts described above, Defendants acted willfully, maliciously, oppressively, and fraudulently, and with full knowledge of the probable consequences and damages to be sustained by Plaintiffs and with the intent to deprive Plaintiffs of their property and legal rights, entitling Plaintiffs to an award of punitive or exemplary damages in a sum sufficient to punish Defendants for said fraudulent conduct.

## FOURTEENTH CAUSE OF ACTION

### UNFAIR COMPETITION

### (Against All Defendants)

192.    Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

193.    At all relevant times, California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq.* (the "UCL") was in effect.

194.    The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . . ."

195.    As described herein, Defendants' offer and sale of Hybrid Tokens was unlawful, unfair, and fraudulent.

196.    As described herein, in connection with Defendants' offer and sale of Hybrid Tokens, Defendants' employed and relied upon unfair, deceptive, untrue, and misleading advertising.

197.    As a result of Defendants' unlawful, unfair, and fraudulent actions, and unfair, deceptive, untrue, and misleading advertising, Plaintiffs have been harmed, including by being denied the products and services promised in the White Papers.

198.   Plaintiffs would not have invested in Hybrid or purchased Hybrid Tokens, or would have invested in Hybrid and/or purchased Hybrid Tokens on different terms, if they know the truth.

## FIFTEENTH CAUSE OF ACTION

### ACCOUNTING

### (Against All Defendants)

199.   Plaintiffs reallege and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

200.   Defendants have never accounted for the funds received by them or their agents, assigns, predecessors, and successors, which were and continue to be wrongfully taken from Plaintiffs.

201.   As a result of Defendants' wrongful taking of Plaintiffs' property, Plaintiffs have been unable to use or invest that property.

202.   As a result of Defendants' unlawful acts and omissions, Plaintiffs have been injured and damaged and demand the equitable remedy of accounting.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered for the following:

203.   That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

204.   That the Court award Plaintiffs damages in an amount to be determined at trial;

205.   That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiffs are entitled;

206.   That the Court award Plaintiffs pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

207.   That the Court award Plaintiffs their reasonable attorneys' fees and costs of suit; *and*

///

208.	That the Court award any and all such relief as the Court may deem just and proper under the circumstances.

### DEMAND FOR JURY TRIAL

209.	A jury trial is demanded pursuant to Fed. R. Civ. P. 38.

Dated:  August 13, 2021

**NOVIAN & NOVIAN LLP**

By:  /s/ Alexander Brendon Gura

FARHAD NOVIAN
ALEXANDER BRENDON GURA

*Attorneys for Plaintiffs*